CC-1999-597                                              1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación de Farmacias de la Comunidad y otros <br>    Demandantes-Peticionarios <br><br>        v. <br><br> Departamento de Salud <br>   Demandado-Recurrido | Certiorari <br><br> 2002 TSPR 13 <br><br> 156 DPR ＿＿＿ |

Número del Caso: CC-1999-597

Fecha: 5/febrero/2002

Tribunal de Circuito de Apelaciones:
                        Circuito Regional I

Juez Ponente:
                        Hon. Yvonne Feliciano Acevedo

Abogados de la Parte Peticionaria:
                        Lcdo. David Noriega Rodríguez
                        Lcdo. José A. Ortiz Daliot
                        Lcdo. Nicolás Gautier
                        Lcdo. Heyda Vigil Mc.Clin

Oficina del Procurador General:
                        Lcda. Mayra J. Serrano Borges
                        Procuradora General Auxiliar

Abogadas de Walgreen Co, Walgreen of Puerto Rico, Inc. y Walgreen of San Patricio, Inc.:
                        Lcda. Yolanda Benítez de Alegría
                        Lcda. Lydia M. Ramos Cruz

Materia: Solicitud de Paralización del Reglamento Núm. 89

        Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asociación de Farmacias de
la Comunidad y otros

Demandantes-Peticionarios


      vs.                    CC-1999-597       CERTIORARI

Departamento de Salud

    Demandado-Recurrido



Opinión del Tribunal emitida por el Juez Asociado Señor Hernández Denton


     San Juan, Puerto Rico, a 5 de febrero de 2002.

> *-...You hadn't exactly gone out of your way to call attention to them had you? I mean like actually telling anyone or anything.*
> *-But the plans were on display...*
> *-On display? I eventually had to go down to the cellar to find them.*
> *-That's the display department.*
> *-With a torch.*
> *-Ah, well the lights had probably gone.*
> *-So had the stairs.*
> *-But look you found the notice didn't you?*
> *-Yes -said Arthur- yes I did. It was on display in the bottom of a locked filing cabinet stuck in a disused lavatory with a sign on the door saying "Beware of The Leopard".*

Arthur Dent enfrentándose a un funcionario administrativo en la novela de Douglas Adams: <u>The Hitchhiker's Guide to the Galaxy</u>.

    Hoy nos toca resolver si es válido el <u>Reglamento Núm. 89 para Regular el Proceso de Evaluación de Solicitudes para el Otorgamiento de Certificados de Necesidad y Conveniencia</u> del Departamento de Salud que se limita a repetir los criterios generales y ambiguos de la ley que

otorga el poder de reglamentación a dicho organismo. Resolvemos que las agencias tienen el deber de especificar, mediante reglamentación, los criterios esbozados de forma muy general en la legislación delegante, para así evitar una aplicación arbitraria e injusta, y proveer guías adecuadas para que las partes afectadas por las acciones administrativas estén debidamente informadas del estado de derecho vigente.

**I**

La Ley Núm. 2 del 7 de noviembre de 1975, según enmendada, 24 L.P.R.A. sec. 334 *et seq.*, otorga al Departamento de Salud el poder de conceder Certificados de Necesidad y Conveniencia (en adelante "Certificados de Necesidad") a ciertas facilidades de salud. A través de estos Certificados, la Asamblea Legislativa ha intentado regular la planificación ordenada de algunas facilidades y servicios de salud para que, de este modo, se pueda "atender adecuadamente las necesidades de salud de la problación [sic], controlar los costos de los servicios de salud y velar porque éstos se presten en aquellos núcleos problacionales [sic] donde sean necesarios." 1983 Leyes de Puerto Rico 402, 403. Para lograr estos objetivos la legislatura entendió indispensable que "se ofrezcan únicamente aquellos servicios de salud, se incurra en aquellas inversiones de capital, o que se adquieran aquellos equipos médicos altamente especializados, cuya necesidad y conveniencia pública haya [sic] sido previamente determinada por el Secretario [o Secretaria de Salud]." Id. Por lo tanto, las facilidades que

quedan cubiertas bajo la Ley 2 requieren un Certificado de Necesidad para poder operar.

Dicha Ley dispone que el Departamento de Salud deberá establecer un reglamento que regule todo lo relativo al proceso de solicitud y otorgamiento de dichos Certificados de Necesidad. A estos efectos, el Departamento promulgó en 1986 el Reglamento Núm. 56 que establecía, entre otras cosas, unos criterios generales y otros específicos que debería utilizar el Secretario o Secretaria de Salud al considerar las solicitudes de Certificados de Necesidad. Este Reglamento fue utilizado por el Departamento de Salud por unos once (11) años. Durante ese tiempo, el Secretario o Secretaria contó con criterios muy específicos que delimitaban su discreción al evaluar las solicitudes.

En agosto de 1997, el Departamento de Salud publicó un Aviso al Público en un periódico de circulación general, mediante el cual notificaba su intención de promulgar un nuevo Reglamento Núm. 89 para Regular el Proceso de Evaluación de Solicitudes para el Otorgamiento de Certificados de Necesidad y Conveniencia.[1] El aviso indicaba el lugar y horario en que se

---

[1] El Aviso al Público leía:
> Mediante la presente se notifica al público en general de la intención del Departamento de Salud de adoptar los siguientes Reglamentos: 1) Reglamento para Regular el Proceso de Evaluación de Solicitudes para el Otorgamiento de Certificados de Necesidad y Conveniencia al amparo de las disposiciones de la Ley Número 2 del 7 de noviembre de 1975, según enmendada... Los Reglamentos propuestos tienen el propósito de reglamentar la expedición de Certificados de Necesidad y Conveniencia...

podría examinar una copia del Reglamento propuesto, y fijaba un término de treinta (30) días a partir de la fecha de publicación del aviso para que las personas interesadas sometieran comentarios por escrito. También indicaba que cualquier persona interesada en solicitar la celebración de una vista administrativa para la discusión de los comentarios debía hacerlo por escrito dentro de un término de treinta (30) días, acompañando un memorando en el cual se expusieran las razones que, a su juicio, ameritaban la celebración de una vista pública. La Asociación de Farmacias de la Comunidad, el Colegio de Farmacéuticos de Puerto Rico, la Sociedad Radiológica de Puerto Rico, y otros, (en adelante "los peticionarios") comparecieron dentro del término establecido y solicitaron la celebración de vista pública.

El Departamento de Salud publicó una notificación sobre la vista en sólo un periódico de circulación general, y notificó a los peticionarios con tan sólo entre tres (3) y cinco (5) días

---

Cualquier persona interesada en someter comentarios por escrito podrá examinar durante horas laborables una copia de los referidos reglamentos en la Oficina de Asesores Legales del Departamento de Salud, Edificio "A", Antiguo Hospital de Psiquiatría, Centro Médido [sic] en San Juan, Puerto Rico y someter los mismos en dicha dependencia en el término de Treinta (30) días contados a partir de la fecha de la publicación de este aviso. Cualquier persona interesada en solicitar la celebración de una vista administrativa para la discusión de los comentarios que tenga a bien someter deberá solicitarla por escrito en el período de tiempo antes indicado acompañada de una [sic] memorando en el cual se expongan las razones que a su juicio ameritan la celebración de una vista pública. The San Juan Star, 25 de agosto de 1997.

de antelación. Durante la vista, los peticionarios se opusieron al borrador del reglamento aduciendo que adolecía de múltiples defectos. En particular, los peticionarios opinaron que la eliminación de los criterios específicos y la limitación de los criterios generales que contenía el Reglamento 56, constituía un curso de acción equivocado y ponía en entredicho la validez del nuevo Reglamento. El Departamento de Salud, sin embargo, aprobó el Reglamento Núm. 89, adoptando sólo unas pocas de las propuestas presentadas en la vista administrativa. El Reglamento fue debidamente presentado ante el Departamento de Estado, y entró en vigor.

Oportunamente, los peticionarios presentaron solicitud de revisión ante el Tribunal de Circuito de Apelaciones. Alegaron, en esencia, que el procedimiento seguido para la aprobación del Reglamento 89 fue contrario a derecho; y que dicho Reglamento es nulo por ser: 1)tan vago y ambiguo que su aplicación ha de ser arbitraria; y 2) por ser contrario a la ley en virtud de la cual se aprobó. El foro apelativo, sin embargo, confirmó la determinación de la Secretaria de Salud y sostuvo la validez del Reglamento. Dicho foro también denegó la moción de reconsideración presentada por los peticionarios.

Inconformes, los peticionarios acuden ante nos repitiendo las alegaciones que hicieran ante el Tribunal de Circuito de Apelaciones. Revocamos.

**II**

La Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, (en adelante "LPAU"), dispone un procedimiento de revisión del proceso de reglamentación. En su Sección 2.7, dicha Ley establece que:

> Cualquier acción para impugnar la validez de su faz de una regla o reglamento por el incumplimiento de las disposiciones de este capítulo deberá iniciarse en el Tribunal de Circuito de Apelaciones dentro de los treinta (30) días siguientes a la fecha de vigencia de dicha regla o reglamento. 3 L.P.R.A. sec. 2127(b).

Esta disposición provee un mecanismo mediante el cual una persona interesada puede impugnar la validez de un reglamento. Los peticionarios en el caso de autos, oportunamente, han impugnado el Reglamento 89 valiéndose de dicha disposición. Pasamos a analizar, pues, sus señalamientos al respecto.

**A.**

En primer lugar, los peticionarios alegan que el proceso de vista pública no ocurrió conforme a lo dispuesto por ley. La Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, 24 L.P.R.A. sec. 334 *et seq.*, que regula los Certificados de Necesidad, dispone en su Artículo 22 que, previa la aprobación del reglamento que establece todo lo relacionado con las solicitudes de Certificados de Necesidad, el Secretario o Secretaria de Salud "celebrará vistas públicas notificando a las personas interesadas mediante publicación en **dos (2)** periódicos de circulación general. La notificación se hará por

lo menos **quince (15)** días antes de la celebración de la vista."
24 L.P.R.A. sec. 334j (*énfasis suplido*).

El Departamento de Salud, sin embargo, alega que esta disposición no es aplicable ya que la Ley Núm. 2 es anterior a la LPAU, y que, por lo tanto, son las disposiciones de la LPAU las que aplican. El Departamento de Salud está en lo correcto al afirmar que cuando la LPAU está en conflicto con alguna Ley Orgánica que es anterior a ella, los procedimientos uniformes establecidos en la LPAU toman precedencia. Asociación de Dueños de Casas de la Parguera, Inc. v. Junta de Planificación, res. el 14 de mayo de 1999, 99 TSPR 75; Hernández O'Farril v. Golden Tower Development Corp., 125 D.P.R. 744 (1990).

Sin embargo, "en cuanto a los procedimientos no contemplados por [la LPAU, dicha Ley] dispone que las agencias deberán reglamentar su práctica" sin contradecir las demás disposiciones de la LPAU. Pagán Ramos v. F.S.E., 129 D.P.R. 888, 901-902 (1992). En el caso específico de los procesos de reglamentación administrativa, como regla general, es facultad discrecional de la agencia celebrar vistas públicas, **salvo que la propia ley de la agencia así lo exija**. La LPAU no establece los requisitos de notificación, ni los términos para notificar una vista pública. Dicha ley dispone únicamente que "[l]as agencias podrán discrecionalmente citar para vista pública, **o si su ley orgánica u otra ley la hacen mandatoria**." 3 L.P.R.A. sec. 2123 (*énfasis suplido*).

La LPAU otorga, pues, gran flexibilidad a la legislatura para que regule con más especificidad en algunos casos todo lo relacionado a vistas públicas en el proceso de reglamentación. Esta legislación es válida aunque sea previa a la LPAU siempre y cuando no sea contraria a las disposiciones de dicha Ley.

En este caso, no hay contradicción ni conflicto entre lo que dispone la LPAU con respecto a las vistas públicas y lo que dispone la Ley Núm. 2. Por lo tanto, son válidas y están vigentes las disposiciones referentes a vistas públicas de la Ley Núm. 2 que no son contrarias a la LPAU, aunque sean anteriores a esta última Ley.

Del expediente surge que en el caso de autos se le notificó a las partes que habían solicitado la vista con solamente entre tres (3) y cinco (5) días de antelación, y no quince (15) como requiere la Ley 2. Además, la notificación de vista pública fue publicada en un solo periódico de circulación general. Por lo tanto, el Departamento de Salud no cumplió con los requisitos procesales que le impone la Ley Núm. 2.

**B.**

Existe otro problema con la vista pública celebrada en este caso que los peticionarios no mencionaron en su alegato, pero que representa una importante irregularidad que debemos traer a colación.[2] La LPAU dispone que el funcionario que presida una

---

[2] "Como se sabe, este Tribunal no tiene que limitarse a la consideración de los errores señalados.  Es nuestra obligación que se haga justicia a aquel que, de acuerdo con el más sano criterio del juzgador, tiene derecho a ella." Ríos Quiñones v. Administración de Servicios Agrícolas, res. el 20 de mayo de 1996, 140 D.P.R. 868 (1996).

vista pública en un proceso de reglamentación "preparará un informe para la consideración de la agencia, en el cual se resuman los comentarios orales que se expongan durante la vista." 3 L.P.R.A. sec. 2123.   Este informe debería estar presente en el récord administrativo. Sin embargo, en ninguna parte del expediente del caso de autos, ni del expediente del proceso de reglamentación en el Departamento de Salud, aparece un informe sobre la vista pública celebrada. Es forzoso, por tanto, concluir que dicho informe nunca se preparó.[3]

Este incumplimiento con las disposiciones de la LPAU nos parece particularmente problemático. La ausencia de este informe limita severamente nuestra facultad revisora.  Dada la parca declaración de propósitos que contiene el Reglamento 89

---

[3] Elevados los autos del proceso de reglamentación en el Departamento de Salud, sólo pudimos encontrar en el expediente un escueto memorando preparado por el Oficial Examinador para el Director de la Oficina de Asesores Legales (y no para la Secretaria de Salud).  En dicho memorando, el Oficial Examinador se limitaba a mencionar que:

> Todos los comparecientes sometieron por escrito el texto de sus ponencias las cuales obran en el expediente del caso.  El Lic. Mario Paniagua comentó además en torno a la necesidad de definirse de una forma más concreta el concepto de "área de servicio". El Dr. David Guzmán en representación del Hospital Ryder así como el Lic. Milton Cruz de la Asociación de Hospitales se colocaron a la disposición del Departamento de Salud para colaborar en el proceso de adopción de un nuevo reglamento para la concesión de CNC's.  El Lic. Milton Cruz sugirió además la creación de un Comité de la Industria para colaborar en dicho proceso.  Todos los demás extremos de las disposiciones de los asistentes a la vista constan en sus ponencias por escrito en el expediente administrativo del proceso.  Memorando de Manuel Fernández Mejías, Oficial Examinador, División de Vistas Administrativas, al Lic. J. Gerardo Cruz Arroyo, Director, Oficina de Asesores Legales (8 de octubre de 1997).

(y que discutiremos a continuación), el no tener tampoco un informe sobre la vista pública nos deja totalmente a ciegas con respecto a las razones y justificaciones que tuvo la agencia al promulgar este Reglamento.

Además, el requisito de que se prepare un informe sobre la vista pública responde a otro importante propósito. La LPAU requiere que la agencia analice todas las sugerencias de las partes interesadas que participen en el proceso de reglamentación. 3 L.P.R.A. sec. 2124. "La agencia tomará en consideración, además de **los comentarios escritos y orales que le hayan sometido**, su experiencia, competencia, técnica, conocimiento especializado, discreción y juicio." Id. (*énfasis suplido*). Mediante la exigencia de que se prepare un informe sobre la vista pública, la LPAU asegura que la participación en dicha vista de todas las partes interesadas sea realmente efectiva. Al preparar el informe, el funcionario que presidió la vista tiene que enfrentar y considerar todos los argumentos y comentarios que hayan hecho todas las partes. De esta manera, pues, se garantiza que dichos comentarios sean escuchados con detenimiento. Como en el caso de autos no se preparó dicho informe, no podemos estar seguros que lo que se ventiló en la vista pública fue adecuadamente considerado por el Secretario o Secretaria de Salud al promulgar el Reglamento. Al no prepararse el informe, pues, queda en duda si la participación de las partes fue realmente considerada como

requiere la ley, o si quedó frustrado este genuino e importante propósito de celebrar la vista pública.

### C.

Existe otro problema importante con el proceso de reglamentación que debemos analizar. Como mencionáramos anteriormente, el Reglamento 89 contiene una lacónica declaración de los propósitos de dicha reglamentación.[4] Entendemos que, en este caso, dicha declaración no es suficiente para satisfacer los requisitos que impone la LPAU.

La LPAU dispone que toda regla o reglamento que sea adoptado o enmendado por una agencia deberá contener "una explicación breve y concisa de sus propósitos o de las razones para su adopción o enmienda." 3 L.P.R.A. sec. 2125(b).

El Código Modelo de Procedimiento Administrativo Estatal (en adelante "Código Modelo"), en el cual está basada en parte la LPAU, contiene una disposición similar que requiere que la agencia responda brevemente y de manera razonada a los

_____

[4] Dicha declaración lee:
> El propósito del presente reglamento lo constituye el deseo del Departamento de Salud de agilizar y expeditar el proceso de consideración y análisis de las solicitudes de concesión de Certificados de Necesidad y Conveniencia así como el atemperar dicho proceso a la actual política pública en torno a la prestación de servicios de salud en Puerto Rico según definida en las disposiciones de las leyes número 190 del 5 de septiembre de 1996 y la número 72 del 7 de septiembre de 1993, según enmendadas. Reglamento Núm. 89 para Regular el Proceso de Evaluación de

comentarios recibidos durante el proceso de reglamentación, y que explique por qué resolvió los asuntos significativos mencionados en dichos comentarios de la manera en que lo hizo. Arthur Earl Bonfield, State Administrative Rule Making sec. 6.10.1 (1986).

El requisito de esta "explicación breve y concisa" en el reglamento final existe para garantizar que los tribunales podamos ejercitar nuestra función revisora de una manera efectiva. Este también es el propósito de la disposición análoga del Administrative Procedure Act, 5 U.S.C. sec. 551 et. seq., (en adelante "APA"). Recurrimos, por lo tanto, a la jurisprudencia federal como guía persuasiva para nuestra interpretación de la LPAU.

El APA dispone: "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C.A. sec. 553(c). Los tribunales federales han interpretado que esta disposición requiere que la agencia incluya una declaración de hallazgos y razones como parte de la regla final. Automotive Parts & Accessories Association v. Boyd, 407 F.2d 330 (D.C. Cir. 1968). Esta declaración permite que un tribunal revisor pueda determinar qué asuntos importantes de política pública fueron ventilados en los procedimientos, y por qué la agencia reaccionó a dichos asuntos con esa reglamentación. Id.

---

Solicitudes para el Otorgamiento de Certificados de Necesidad y Conveniencia, art. II.

El Tribunal de Apelaciones para el Circuito del Distrito de Columbia también ha exigido que la "explicación breve y concisa" contenga respuestas a los comentarios significativos e importantes que hicieron los ciudadanos, y que explique por qué esas sugerencias no fueron adoptadas y cómo los problemas mencionados por los ciudadanos fueron resueltos. Rodway v. USDA, 514 F.2d 809 (D.C. Cir. 1975). Esta es la doctrina conocida como el "vital questions doctrine". La agencia debe analizar en la "explicación breve y concisa" todas las cuestiones vitales que se hayan presentado en el foro administrativo.

Este requisito no sólo ha sido exigido por el Tribunal Supremo de los Estados Unidos cuando se reglamenta un área, sino que también se requiere en situaciones en que una agencia escoge flexibilizar o eliminar la reglamentación de un área previamente regulada. Así pues, en Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance Co., 463 U.S. 29 (1983), el tribunal expuso:

> [T]he revocation of an extant regulation is substantially different than a failure to act. Revocation constitutes a reversal of the agency's former views as to the proper course. A "settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to." Atchison, T.&S.F.R. Co. v. Wichita Board of Trade, 412 U.S. 800, 807-808 (1973). Motor Vehicle, supra, en la pág. 41-42.

Por lo tanto, concluyó el Tribunal Supremo, una agencia que cambia su curso de acción al derogar un reglamento está obligada a suplir un análisis razonado del cambio. Id.

En el caso de autos, el Departamento de Salud decidió derogar un Reglamento anterior que era mucho más específico y que regulaba más intensamente los criterios para otorgar los Certificados de Necesidad. El Departamento de Salud se limitó a decir que el nuevo Reglamento 89 pretendía agilizar y expeditar el proceso de otorgamiento de los Certificados de Necesidad, y atemperarlo a la política pública establecida en las nuevas leyes de la Reforma de Salud. Entendemos que esta explicación fue insuficiente. Como mínimo, la disposición de LPAU que exige que se incluya una "explicación breve y concisa" de los propósitos o de las razones para la adopción o enmienda de un reglamento, requiere que el Departamento de Salud, en este caso, explique por qué ha decidido suplantar el Reglamento anterior con uno mucho más ambiguo y limitado. Esta explicación es especialmente importante dado el hecho que todos los comentarios presentados por los peticionarios objetaban la derogación de los criterios específicos del Reglamento 56.

Nuestra función revisora se ha visto frustrada en este caso por la ausencia total de alguna declaración de la agencia que nos revele las razones que tuvo para actuar de la manera en que actuó. No podemos saber si su acción fue arbitraria o caprichosa si no conocemos por qué tomó dicha acción. De las disposiciones citadas de la LPAU se desprende que toda reglamentación debe

incluir una explicación adecuada de sus propósitos y razones para su adopción o enmienda. Además, esta "obligación es deseable porque no le impondrá una carga adicional significativa a las agencias y mejorará considerablemente los frutos de la reglamentación." Bonfield, supra (*traducción nuestra*).

### III

Además de los defectos procesales que hemos discutido, los peticionarios alegan que existen varios problemas sustantivos con el Reglamento 89.

### A.

El primero de éstos es que el Reglamento está en contravención con la ley que lo autoriza. Sabido es que "un reglamento promulgado para implementar [sic] la ejecución de una ley puede complementarla, pero no estar en conflicto con ésta." P.S.P. v. Comisión Estatal de Elecciones, 110 D.P.R. 400, 409 (1980). Además, "un reglamento o actuación administrativa claramente en conflicto o en contra de la ley es nulo." Id.

La Ley Núm. 2 del 7 de noviembre de 1975, según enmendada, otorga al Departamento de Salud el poder de conceder Certificados de Necesidad a ciertas facilidades de salud. Dicha Ley establece que el Departamento de Salud deberá promulgar un reglamento que disponga todo lo relativo al proceso de solicitud y otorgamiento de dichos Certificados de Necesidad. 24 L.P.R.A. sec. 334j. Los peticionarios alegan que el nuevo Reglamento 89, al eliminar los criterios específicos para otorgar los

Certificados de Necesidad, arremete contra la intención legislativa de la cual nació el esquema administrativo de los Certificados de Necesidad.

La Exposición de Motivos de la Ley 2 establece que la creación de los Certificados de Necesidad tiene como propósito: 1) mantener una planificación ordenada de las facilidades y servicios de salud para atender adecuadamente las necesidades de salud de la población; 2) controlar los costos de los servicios de salud; y 3) velar porque éstos se presten en aquellos núcleos poblacionales donde sean necesarios. 1983 Leyes de Puerto Rico 402, 403. La legislatura también explicó que sólo se deben otorgar Certificados de Necesidad a los servicios de salud cuya necesidad y conveniencia hayan sido previamente determinadas **por el Secretario o Secretaria de Salud.** Id. Surge, pues, de la Exposición de Motivos, que la legislatura delegó gran discreción al Secretario o Secretaria de Salud para determinar cuándo un servicio de salud es necesario y conveniente, cómo se deben controlar los costos de los servicios, y cuál esquema de planificación ordenada es el más apropiado.

Los peticionarios alegan que la citada Exposición de Motivos establece una firme política pública de intensa regulación de los servicios de salud, bajo la cual el Secretario o Secretaria de Salud no puede decidir abrir las puertas a competidores y establecer una filosofía más *laissez faire* en la cual los servicios de salud se enfrenten a las exigencias

del mercado libre. No podemos estar de acuerdo con esta posición. Aunque la legislatura ha decidido regular la entrada al mercado de servicios de salud a través de los Certificados de Necesidad, la determinación de cuán intensa va a ser esta regulación ha quedado en manos del Secretario o Secretaria de Salud.  No podemos aceptar el planteamiento de que la Ley 2 adoptó una teoría o modelo económico en específico del cual no se puede apartar el Secretario o Secretaria de Salud. Precisamente, entendemos que la Ley tenía el propósito de delegar en el peritaje de dicho Secretario o Secretaria la facultad para determinar cuánta intromisión del Estado en el mercado es necesaria.

Hemos hecho mención anteriormente de que al Secretario o Secretaria de Salud, a través de la Ley 2 "se le delegan amplios poderes, con normas para delimitar su ejercicio, pero otorgándole a la vez discreción en el desarrollo y ejecución de la política pública." Laboratorio Clínico Instituto Central de Medicina Avanzada v. Laboratorio Clínico Borinquen, Inc., res. el 9 de septiembre de 1999, 99 TSPR 136. Es imperativo que respetemos esta decisión legislativa y que le otorguemos cierta flexibilidad al Secretario o Secretaria para que ajuste la regulación de los servicios de salud al cambiante clima socio-económico y a las exigencias de comunidades específicas.

Entendemos que el Reglamento 89 no está en contradicción con la Ley 2 por el mero hecho de que su adopción haya resultado en una disminución de las barreras a la entrada al mercado de

los servicios de salud. Sin embargo, también hemos quedado convencidos de que existen otros problemas con dicho Reglamento que debemos considerar.

**B.**

Si bien es cierto que la legislatura puede delegar amplias facultades y discreción a una agencia administrativa, también es cierto que una agencia no puede ejercitar su discreción de manera arbitraria o caprichosa.

> "La función de los tribunales generalmente ha de ir dirigida a evaluar: 1) si la actuación administrativa está autorizada por la ley; 2) si se delegó poder de reglamentación; 3) si la reglamentación promulgada está dentro de los amplios poderes delegados; 4) si al aprobarse el reglamento se cumplió con las normas procesales de la ley orgánica y de las leyes especiales; y 5) **si la reglamentación es arbitraria o caprichosa.**" Marketing and Brokerage Specialists, Inc. v. Departamento de Agricultura, 118 D.P.R. 319, 326 (1987) (*énfasis suplido*).

Ya hemos discutido el primero y el cuarto de estos factores. El segundo y el tercero no son de aplicación en el caso de autos. Por lo tanto, pasamos ahora a discutir si la actuación del Departamento de Salud ha resultado ser arbitraria o caprichosa.

La doctrina de la delegación de poderes es bastante flexible. La legislatura puede delegar su autoridad a una agencia de manera amplia, siempre y cuando establezca normas adecuadas o un principio inteligible para guiar a la agencia. Luce & Co. v. Junta de Salario Mínimo, 62 D.P.R. 452 (1944). Esta regla se aplica de manera liberal. Véase, en general, K.C. Davis and Richard J. Pierce, Jr., Administrative Law Treatise sec. 6.2 (1994).

Sin embargo, para atemperar la presunción de validez que se le otorga a la delegación de poderes, varios comentaristas han sugerido que los tribunales exijan, en casos donde dicha delegación es bastante vaga o ambigua, que la agencia especifique más claramente, a través de la reglamentación, los parámetros bajo los cuales va a ejercitar la autoridad delegada. "It has been urged that the courts should impose a requirement of agency standards whenever statutory standards are inadequate." Bernard Schwartz, Administrative Law 69-70 (1991). Davis expone, por su parte, que: "When legislative bodies have failed to provide standards, the courts should not hold the delegation unlawful but should require that the administrators must as rapidly as feasible supply the standards." Davis, Administrative Law Treatise 52 (Supp. 1970). Estos comentaristas entienden que tal proceder sería sabio ya que ayudaría a mantener la discreción que tienen las agencias dentro de los límites de la arbitrariedad. Así lo ha reconocido el propio Tribunal Supremo de los Estados Unidos en Sandin v. Conner, 515 U.S. 472 (1995), donde enfatizó el importante rol que las reglas promulgadas por las agencias desempeñan al servirle para delimitar la discreción delegada. Además, al proveer estándares definidos, la función revisora de los tribunales se puede ejercer más efectivamente.

Estas recomendaciones de los comentaristas y nuevas tendencias en el derecho administrativo no responden sólo a preocupaciones sobre la doctrina de separación de poderes, sino

que también van ligadas a las exigencias del debido proceso de ley. Davis y Pierce, por ejemplo, exponen que, cuando las agencias promulgan reglamentos, se promueven, en términos generales, la justicia y la igualdad. Davis and Pierce, *supra*, sec. 6.7. Esta observación también ha sido hecha por otros comentaristas: "Use of rulemaking to make innovations in agency policy is fairer than total reliance on case-by-case adjudication." Schwartz, *supra*, en la pág. 217.

En primer lugar, las reglas legislativas le proveen a las partes afectadas una notificación previa más clara sobre qué conducta es permisible y qué conducta es impermisible. Davis and Pierce, *supra*, sec. 6.7. La opinión del Tribunal de Circuito de Apelaciones para el Primer Circuito en *Massachussets v. Blackstone*, 67 F.3d 981 (1st Cir. 1995), ilustra lo valiosa que puede ser la reglamentación administrativa al proveer a las partes afectadas información sobre qué tipos de conducta son aceptables.

A la misma vez, la reglamentación ayuda a evitar el efecto temporal disparejo que tienen las normas anunciadas y aplicadas en procedimientos adjudicativos. Davis and Pierce, *supra*, sec. 6.7. Por último, el procedimiento de reglamentación le permite participar en el proceso decisional de la agencia a las personas potencialmente afectadas por la acción administrativa. *Id*. Cuando la agencia establece estándares claros a través de sus reglamentos, pues, se crea un sistema más justo en el cual las partes afectadas están bien informadas sobre las exigencias de

la ley, y pueden cumplir con ellas de manera más cabal, efectiva y eficiente.

En la casuística estadounidense, como ya hemos visto, estas recomendaciones de los comentaristas han recibido alguna atención. La LPAU fue adoptada con base en el modelo del APA y en el Código Modelo del 1981 redactado por el National Conference of Commisioners on Uniform State Laws. Por lo tanto, la jurisprudencia interpretativa del APA y de estatutos de otros estados basados en el Código Modelo, así como las contribuciones de comentaristas sobre dicho estatuto modelo, son autoridad muy persuasiva al interpretar la LPAU. Pasemos primero a discutir algunos  de los precedentes desarrollados en la jurisprudencia federal.

En una importante decisión del Tribunal de Distrito para el Distrito de Columbia, **se exigió que una agencia estableciera estándares administrativos mediante reglamentación.** Amalgamated Meat Cutters v. Connally, 337 F. Supp. 737 (D. D.C. 1971). El Circuito de Apelaciones del Distrito de Columbia también llegó a la misma conclusion al enfrentarse a similar interrogante: "Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible". Environmental Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 598 (D.C. Cir. 1971). La obligación de las agencias de reglamentar áreas en que la delegación es ambigua también fue enunciada por el Tribunal Supremo de los Estados Unidos: "The

power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Morton v. Ruiz, 415 U.S. 199, 231 (1974). Esta tendencia a exigir que las agencias promulguen reglamentos que especifiquen lo dispuesto por la legislatura es evidente también en las decisiones de los tribunales federales en White v. Roughton, 530 F.2d 750 (7th Cir. 1976); y Holmes v. New York City Housing Authority, 398 F.2d 262 (2d. Cir. 1968).

Algunos estados han sido aún más agresivos al requerirle a las agencias que adopten reglamentos específicos. Véase, e.g., Megdal v. Oregon State Board of Dental Examiners, 605 P.2d 273 (Or. 1980) (exigiendo que una agencia adopte reglas que definan "unprofessional conduct"); y Pennsylvania State Board of Pharmacy v. Cohen, 292 A.2d 277 (Pa. 1972). De hecho, el Código Modelo del 1981 contiene una disposición específica que requiere que las agencias:

> as soon as feasible and to the extent practicable, adopt rules, in addition to those otherwise required by this Act, embodying appropriate standards, principles and procedural safeguards that the agency will apply to the law it administers. Model State Administrative Procedure Act sec. 2-104(3) (1981).

Esta disposición tiene como propósito el que las agencias actúen tan rápido como sea posible para estructurar mediante reglamentos la discreción procesal y sustantiva que se les ha otorgado **para así minimizar la arbitrariedad y, a la misma vez, dar notificación adecuada al público sobre el estado de derecho**

**vigente**. Bonfield, supra, sec. 4.3.1. Esta regla exige que las agencias elaboren los contornos de dicha discreción mediante reglamentos y no órdenes adjudicativas ad hoc. Id.

Así pues, en Illinois, por ejemplo, un estatuto dispone que "[t]oda regla que implante un poder discrecional a ser ejercitado por una agencia incluirá los estándares mediante los cuales la agencia ejercitará dicho poder." 5 Ill. Comp. Stat. Ann. sec. 100/5-20 (West 1993) (*traducción nuestra*). De manera similar, en Utah se creó un estatuto que establece que "toda agencia promulgará reglas cuando la acción de la agencia (a) autorice, requiera, o prohíba una acción... [o] (b) provea o prohíba un beneficio material." Utah Code Ann. Secs. 63-46a-3(2)(a), 63-46a-3(2)(b) (Supp. 1987).

De igual manera, varias decisiones de las cortes supremas de algunos estados requieren de modo similar la reglamentación. En Megdal, supra, el Tribunal Supremo de Oregon concluyó que cuando la ley orgánica de una agencia contiene un estándar estatutario vago y amplio, y a la misma vez le otorga a la agencia una autoridad general para reglamentar, la legislatura espera que la agencia formule los contornos principales de su discreción mediante la reglamentación. Megdal, supra. En un caso similar, el Tribunal Supremo de New Jersey también invalidó una acción administrativa por entender que la agencia debía establecer estándares a través de reglas. Boller Beverages, Inc. v. Davis, 38 N.J. 138 (1962).

Algunos de los tribunales estatales de mayor jerarquía han sugerido incluso que, en algunas circunstancias, cuando una agencia se ha negado a elaborar la ley delegante a través de reglamentación apropiada, la aplicación de dicha ley puede constituir una violación al debido proceso de ley. Véase, Arthur Earl Bonfield, State Administrative Rule Making sec. 4.3.1A(c) (Supp. 1993). Así, pues, en Elizondo v. Department of Revenue, 194 Colo. 113 (1977), el Tribunal Supremo de Colorado invalidó la acción de una agencia al denegarle una licencia bajo probatoria a un conductor porque la agencia no había promulgado un reglamento que guiara las determinaciones de sus oficiales en cuanto a la concesión de dichas licencias. El tribunal entendió que el debido proceso de ley exigía que se promulgara tal reglamento **para que los peticionarios pudieran saber qué factores se considerarían pertinentes al evaluar su petición, y así poder presentar la evidencia y los argumentos apropiados.** Véanse en general, City of Atlanta v. Hill, 238 Ga. 413 (1977); Cohen, supra; Holmes, supra; Barnes v. Merritt, 376 F.2d 8 (5th Cir. 1967); Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964); City of Santa Clara v. Kleppe, 418 F. Supp. 1243 (N.D. Cal. 1976); Baker-Chaput v. Cammett, 406 F. Supp. 1134 (D.N.H. 1976); St. Augustine High School v. Louisiana High School Athletic Association, 270 F. Supp. 767 (E.D. La. 1967); Smith v. Ladner, 288 F. Supp. 66 (S.D. Miss. 1966).  Debe quedar más que claro, sin embargo, que "el proceso de hacer derecho nuevo en el curso de una adjudicación administrativa no constituye una violación

*per se* del debido proceso de ley". <u>Amerada Hess Pipeline Corp. v. Alaska Pub. Utils. Commission</u>, 711 P.2d 1170, 1178 (Alaska 1986) (*traducción nuestra*).

La Sección 2-104(3) del Código Modelo codifica en parte, pues, lo resuelto por los tribunales supremos de algunos estados. Bonfield, <u>supra</u>. La razón de ser de esta codificación está claramente expresada en los Comentarios al Código Modelo:

> [T]o the extent an agency can feasibly and practically further structure its discretion by rule **to avoid arbitrary action, and to give fair advance notice to the public of the precise content of the law it administers**, the agency should be required to do so. Model State Administrative Procedure Act sec. 2-104(3) Comment (1981) (*énfasis nuestro*).

Cabe repetir, pues, que al requerir que la agencia promulgue reglamentación apropiada no sólo se evita la arbitrariedad en las decisiones administrativas, sino que se asegura que se cumpla a cabalidad con las exigencias del debido proceso de ley en cuanto a la notificación al público del contenido y la sustancia de la ley.

En Puerto Rico, la jurisprudencia ya apunta hacia esta misma conclusión. En <u>Marketing and Brokerage Specialists</u>, <u>supra</u>, nos expresamos al respecto, y resolvimos que "lo que actualmente se requiere como medida fiscalizadora es que las agencias aprueben reglamentos que delimiten o precisen sus facultades al amparo de la ley y así evitar actuaciones ilegales o arbitrarias." Hemos reconocido explícitamente, al igual que el Tribunal Supremo de los Estados Unidos, que cuando en un caso *"no hay estándares* en la ley que gobiernen el ejercicio de la

discreción que la ley reconoce, el esquema permite y promueve una aplicación arbitraria y discriminatoria de la ley." Soto v. Jiménez Muñoz, 112 D.P.R. 477, 499 (1982) (*énfasis en original*), citando Papachristou v. City of Jacksonville, 405 U.S. 156, 170 (1972). En Soto, supra, también se reiteró la conclusión de que una agencia debe delimitar su autoridad a través de reglamentos. Id. a la pág. 500. De esta manera, se facilita la revisión judicial en áreas donde el ámbito de discreción delegado es excesivo. Torres Arzola v. Policía de Puerto Rico, 117 D.P.R. 204, 211 (1986). Hoy reconocemos, además, que la reglamentación, en ciertos casos, se hace necesaria para proveer a los solicitantes de permisos y a las partes afectadas por una acción administrativa guías adecuadas sobre las exigencias de ley con las que deben cumplir.

Por otro lado, es de suma importancia recordar que las agencias, por más poderes que se les haya delegado, no pueden actuar de manera arbitraria ni al cambiar sus reglamentos, ni al establecer reglas nuevas. Carrero Gueits v. Departamento de Educación, 141 D.P.R. 830 (1996). Tampoco pueden actuar arbitraria o caprichosamente al aplicar sus reglamentos a casos particulares. "[E]l ejercicio de poderes administrativos a base de consideraciones caso por caso, no a base de una ley o de un reglamento, adolece del defecto constitucional de ambigüedad (*vagueness*)." Soto, supra, citando Pennsylvania State Board, supra (*énfasis en original*). Por ello, se requiere que las decisiones administrativas sean consistentes al aplicar los

reglamentos. "La determinación administrativa no puede producir soluciones contradictorias para situaciones fundamentalmente idénticas." Textile Dye Workers, Inc. v. Secretario de Hacienda, 95 D.P.R. 708, 715 (1968), citando South Porto Rico Sugar Co. v. Junta Azucarera de Puerto Rico, 82 D.P.R. 847 (1961).

De hecho, el Código Modelo del 1981 ha optado por requerir que las agencias delimiten su discreción a través del proceso de reglamentación, **y no mediante sus decisiones adjudicativas**, aunque las mismas puedan ser detalladas y extensas. Bonfield, supra. Varios estados han incorporado esta regla a su derecho administrativo. Id. Incluso algunos casos federales han demostrado una preferencia por la reglamentación sobre la adjudicación. Véanse, Morton, supra, (el Secretario del Interior no puede limitar la categoría de Indios elegibles para recibir beneficios mediante adjudicación); Ford Motor Co. v. FTC, 673 F.2d 1008 (9th Cir. 1981) (el FTC debe utilizar la reglamentación y no la adjudicación al cambiar derecho existente aplicable de manera general a las prácticas de reposesión y reventa de los distribuidores de automóviles); y Patel v. INS, 638 F.2d 1199 (9th Cir. 1980) (el INS no puede requerir, mediante un proceso adjudicativo, que unas inversiones creen empleos para cualificar para ciertas exenciones). Sin embargo, somos de la opinión que no es necesario en este momento exigir que toda demarcación de la

discreción administrativa se haga exclusivamente mediante reglamentación.

Como alternativa para evitar la arbitrariedad en las determinaciones administrativas, cuando ni la ley ni la reglamentación proveen suficientes estándares que limiten la discreción de la agencia, el Tribunal Supremo de los Estados Unidos ha establecido que la agencia tiene un deber de justificar cualquier cambio en las normas que ha utilizado en casos previos. Véanse, Atchison, Topeka & S.F. Ry. v. Wichita Board of Trade, 412 U.S. 800 (1973); y Motor Vehicle Manufacturers Association v. State Farm Mutual Ins. Co., 463 U.S. 29 (1983). En estos casos, en ausencia de reglamentación, los tribunales federales han exigido que la agencia establezca un sistema de precedentes, con decisiones detalladas, fundamentadas, y con determinaciones de hecho y conclusiones de derecho, que hagan posible la revisión judicial efectiva. Davis and Pierce, supra, sec. 17.2. De ahí que el tribunal en Ruckelshaus, supra, haya explicado que: "Discretionary decisions should more often be supported with findings of fact and reasoned opinions."

Esta doctrina ha sido avalada por este Tribunal al resolver que "la agencia, al adjudicar, tiene que crear una regla o norma que tenga aplicación general a todas aquellas partes que en el futuro estén en idéntica situación." Ruiz Hernández v. Mahiques, 120 D.P.R. 80, 86 (1987). Por lo tanto, la ausencia de guías específicas, ya sea en la ley o en la

reglamentación, que delimiten la discreción de una agencia puede ser subsanada en algunos casos si dicha agencia establece un sistema en el cual emite decisiones detalladas, razonadas y fundamentadas, que crean precedente, pueden ser revisadas por los tribunales para evitar la arbitrariedad, y sirven de guía accesible al público en general.

En el caso de autos, nos enfrentamos a una legislación que delega en el Departamento de Salud la autoridad para emitir Certificados de Necesidad. La Ley 2 establece en su Artículo 3 que el Secretario o Secretaria "establecerá mediante reglamento los criterios para expedir o denegar el certificado de necesidad y conveniencia." 24 L.P.R.A. sec. 334b. La obligación del Secretario o Secretaria de Salud de promulgar este reglamento se reitera en el Artículo 22 de la Ley 2. 24 L.P.R.A. sec. 334j. Además, el Artículo 3 requiere que el Secretario o Secretaria utilice siete (7) criterios generales que provee la Ley. Id. Somos de la opinión que la Ley 2 constituye un mandato directo al Secretario o Secretaria de Salud para que especifique criterios y delimite su autoridad discrecional a través de copiosa reglamentación. Nuestra conclusión se sustenta al considerar que el Reglamento 56 que promulgó el Departamento de Salud originalmente en el 1986, y que rigió el esquema de los Certificados de Necesidad por once años, era muy específico y extenso.

El Reglamento 56 contenía veintiún (21) criterios generales. Entre estos, incluía los siete (7) criterios que

provee la Ley 2. Además, dicho Reglamento estableció una serie de criterios específicos que limitaban la discreción de la agencia al evaluar solicitudes de Certificados de Necesidad para diferentes tipos de servicios de salud particulares. El Reglamento 56 tenía catorce (14) páginas que contenían alrededor de cien (100) criterios específicos y otras cinco (5) páginas con unas veinticinco o treinta (25 ó 30) reglas referentes a las "Organizaciones para el Mantenimiento de la Salud", o lo que se conoce, por sus siglas en inglés, como HMOs. Los criterios específicos estaban subdivididos por tipo de facilidad. Por ejemplo, se definían reglas diferentes para distintos tipos de hospitales (generales, pediátricos, psiquiátricos, de tuberculosis, y oncológicos), para distintos tipos de centros (de diálisis renal, de rehabilitación, casas de salud, de cuidado extendido, de cirugía ambulatoria), para farmacias, para laboratorios clínicos, para distintas facilidades radiológicas (convencional, tomografía computarizada, resonancia magnética, microscopía electrónica, etc.), y para bancos de sangre. Para cada uno de estos tipos de facilidades se establecían criterios muy detallados como por ejemplo: el número de camas de cuidado general en un hospital por habitante del área de servicio, el porciento de ocupación que debían tener las facilidades, la distancia mínima entre la facilidad y un hospital, la cantidad de procedimientos a realizarse por semana, el número de facilidades por habitante, etc.

El nuevo Reglamento 89 se promulgó en severo contraste. Dicho Reglamento sólo expone nueve (9) criterios generales, siete (7) de los cuales son idénticos a los que provee la Ley 2. Todos los criterios específicos (las catorce páginas de reglamentación con alrededor de cien criterios subdivididos por tipo de facilidad) fueron eliminados. Sólo sobrevivieron tres reglas referentes a solicitudes especiales y exenciones aplicables, entre otros, a los HMOs.

Este cambio drástico en la reglamentación ha tenido el efecto de eliminar todo límite a la discreción del Secretario o Secretaria de Salud más allá de los que, de manera ambigua, establece la Ley. El hecho de que el Secretario o Secretaria pueda utilizar criterios distintos en cada caso nos parece particularmente problemático, sobre todo dado el mandato presente en la Ley 2 que exige que el Secretario o Secretaria reglamente el área.

No podemos permitir que el Secretario o Secretaria de Salud evalúe las solicitudes de Certificados de Necesidad sin criterios específicos que limiten su discreción y, a su vez, hagan posible que los tribunales constaten que las decisiones que se están tomando no son arbitrarias o caprichosas. Para poder ejercer nuestra tan importante función revisora de manera efectiva, necesitamos una serie de criterios y guías que nos ayuden a asegurarnos que la agencia está utilizando su pericia diligentemente y haciendo determinaciones consistentes y justas.

Recientemente hemos hecho hincapié en la discreción que tiene el Secretario o Secretaria al evaluar las solicitudes. Laboratorio Clínico, supra. Sin embargo, dicha discreción no puede ser ilimitada. Hemos establecido claramente que "el legislador dejó en manos del Secretario o Secretaria la determinación de conceder o denegar los certificados requeridos, **sujeto a unas guías y criterios, que aparejan un ámbito de discreción.**" Id. (*énfasis suplido*). Son precisamente estas guías las que garantizan que las decisiones del Secretario o Secretaria no sean arbitrarias. En Laboratorio Clínico, supra, al resolver que el Secretario o Secretaria podía hacer excepciones a los criterios sumamente específicos que establecía el antiguo Reglamento 56, hicimos evidente la flexibilidad que tiene dicho funcionario al aplicar los criterios específicos del Reglamento, siempre y cuando sus decisiones se apoyen en prueba sustancial, conforme a las normas aplicables y **sin arbitrariedad**. Id.

Además, es necesario que el Departamento de Salud establezca claramente, y de manera específica, los factores a considerarse al evaluar las solicitudes de Certificados de Necesidad, para que los solicitantes estén bien informados al respecto antes de comenzar el proceso. De esta manera, un solicitante puede preparar mejor su solicitud incluyendo toda la evidencia y los argumentos pertinentes. Los solicitantes también deben poder evaluar las posibilidades que tienen de adquirir un Certificado de Necesidad para cierta facilidad de

servicios de salud **antes** de comenzar a hacer inversiones de tiempo y otros recursos en un proyecto. Esto asegura un proceso más fluido y eficiente en el cual se desperdicien menos recursos y se mantenga mayor estabilidad en la industria de los servicios de salud. Así, pues, se promueve más efectivamente el propósito original de la Ley de Certificados de Necesidad y Conveniencia.

Entendemos que, basado en la jurisprudencia que discutimos anteriormente, el Departamento de Salud tiene dos opciones: 1) promulgar un reglamento más específico que no se limite a tan sólo repetir los criterios ambiguos que provee la Ley; o 2) establecer un sistema en el cual emita decisiones detalladas, razonadas y fundamentadas, accesibles al público en general, susceptibles de formar precedente, y que puedan ser revisadas por los tribunales para evitar arbitrariedad en su aplicación. De otra manera estaríamos permitiendo que un área de tan crucial importancia como los servicios de salud pudiera quedar bajo la discreción ilimitada del Secretario o Secretaria de Salud. Esto constituiría una inaceptable renuncia a nuestra trascendental función revisora como últimos intérpretes de nuestra Constitución y nuestras leyes.

Por lo tanto, concluimos que el Reglamento 89 es sustantivamente insuficiente para satisfacer el mandato de la Ley 2, y las exigencias del debido proceso de ley y de la doctrina de no-delegación por dejar puertas abiertas a la arbitrariedad y los caprichos, y por no proveer guías adecuadas a los solicitantes de Certificados de Necesidad.

**IV**

De los autos se desprende que el Departamento de Salud intentó subsanar la ambigüedad del nuevo Reglamento 89 mediante la aprobación del Memorando Circular 1997-1. Este Memorando aclara y especifica parcialmente cinco (5) de los nueve (9) criterios generales que contiene el Reglamento 89 y ha sido aplicado por el Departamento en numerosas solicitudes de Certificados de Necesidad y Conveniencia, algunas de las cuales están pendientes de revisión judicial.[5] En conjunto, el Memorando y el Reglamento 89 le proveen un total de veinte (20) criterios generales al Secretario o Secretaria. Aún tomando en cuenta ambos documentos, sin embargo, la discreción del Secretario o Secretaria queda menos limitada que bajo tan sólo los criterios **generales** del Reglamento 56. De más está decir que no existe ninguna reglamentación actual que compare en nivel de especificidad a los criterios **específicos** del Reglamento 56, los que, no sólo en cantidad sino también en calidad, restringían de manera precisa la discreción del Secretario o Secretaria.

El nivel de ambigüedad presente en este Memorando surge claramente si comparamos algunas de sus disposiciones con algunos de los criterios específicos del antiguo reglamento. Por ejemplo, el Memorando explica que al analizar la necesidad actual y proyectada que tiene la población afectada de los

---

[5] Las partes no nos han informado si el Departamento de Salud ha aprobado criterios adicionales o modificado los que originan la controversia de

servicios contemplados se debe tener en cuenta: 1) el número de facilidades del mismo tipo, 2) indicadores socioeconómicos de utilización per cápita de los servicios propuestos, 3) la población fija en el área, 4) las características socioeconómicas de la población, y 5) los patrones de incidencia de enfermedades o condiciones en el área. Sin embargo, el Memorando no especifica, como hacía el Reglamento 56, los parámetros aceptables para cada uno de los distintos tipos de facilidades. Con sólo decir que se va a considerar la población, se deja al completo arbitrio del Secretario o Secretaria, en cada caso, cuántas facilidades por persona son necesarias, por ejemplo.

El Reglamento anterior sí fijaba números y límites (distintos para cada clase de facilidad) para estos factores de suma importancia. Aunque no es necesario que la agencia establezca números o cantidades invariables, entendemos que es necesario que haya algunas guías de cuáles son los niveles aceptables para este tipo de criterio. Sólo enumerar las cuestiones a considerarse, sin enunciar a base de qué se van a evaluar dichas cuestiones, permite que los funcionarios apliquen unos estándares distintos a casos idénticos, y conllevaría decisiones arbitrarias sin necesidad de fundamentarse en nada. Además, el solicitante prospectivo no tendría manera de medir la probabilidad de que se le conceda un Certificado de Necesidad. Esto podría conllevar el

---

autos. Por ende, en correcta metodología adjudicativa, limitaremos nuestro

desperdicio de su tiempo y la pérdida de su inversión en una facilidad de servicios de salud. Tal resultado frustraría la intención de la Ley de Certificados de Necesidad y Conveniencia.

El Memorando Circular tampoco es suficiente para subsanar la ambigüedad del Reglamento 89, y asegurar que las determinaciones del Secretario o Secretaria no sean arbitrarias o caprichosas. Al llegar a esta conclusión, no podemos ignorar, además, que el Departamento de Salud circuló el Memorando unos meses después de haber celebrado vista pública y escuchado las apasionadas quejas de los peticionarios con respecto a la ambigüedad del Reglamento 89. El Memorando fue circulado sólo unos días antes de que los peticionarios presentaran su Solicitud de Revisión ante el Tribunal de Circuito de Apelaciones. No podemos ratificar este intento por parte del Departamento de subsanar la vaguedad del Reglamento a última hora, esquivando el proceso de notificación y comentarios.

Es importante aclarar que no exigimos que los reglamentos de una agencia sean necesariamente tan específicos como lo era el Reglamento 56. Entendemos, sin embargo, que el nivel de ambigüedad del nuevo Reglamento 89, aún complementado por el Memorando Circular, es inaceptable. Sí requerimos que el Departamento de Salud establezca unos estándares manejables y determinados, aunque no inflexibles, para garantizar que todos los solicitantes reciban un trato igual y justo. Además, repetimos que el requerir reglamentación específica no conlleva

---

análisis a los documentos ante nos.

una regulación más ni menos intensa de las fuerzas del mercado. No estamos exigiendo, por ejemplo, que el Departamento sólo permita una farmacia por vecindario; estamos precisando que el Departamento establezca parámetros flexibles pero específicos (tan estrictos o tan *laissez faire* como crea conveniente) para que las decisiones no puedan ser arbitrarias. La agencia, por ejemplo, puede determinar que sólo se concederán Certificados de Necesidad a una farmacia por vecindario, o puede decidir conceder Certificados de Necesidad a entre veinte (20) y treinta (30), dependiendo del tamaño del vecindario.

De esta manera se minimiza la posibilidad de la actuación administrativa arbitraria, y se le da a los solicitantes una buena manera de estimar sus posibilidades de obtener un Certificado de Necesidad. Basándose en este estimado, un solicitante puede tomar una decisión más informada e inteligente sobre si vale la pena o no continuar con su proyecto de inversión en una facilidad de servicios de salud.

## V

Los peticionarios alegan que hay un problema adicional con el uso del Memorando al evaluar las solicitudes de Certificados de Necesidad. Las guías contenidas en dicho Memorando, entienden los peticionarios, no son meras directrices o reglamentaciones menos formales, sino que constituyen criterios sustantivos que afectan directamente los derechos, procedimientos y prácticas aplicables al público en general, y tienen efecto legal. Como el Departamento de Salud no

estableció estos criterios siguiendo el proceso de reglamentación establecido en la LPAU, los peticionarios alegan que el Memorando fue promulgado ilegalmente y no puede ser utilizado por el Secretario o Secretaria al evaluar solicitudes de Certificados de Necesidad.

No todas las reglas que aprueban las agencias, sin embargo, tienen que ser aprobadas mediante el procedimiento de notificación y comentarios de la LPAU.

> "[L]as agencias administrativas aprueban directrices (*guidelines*) u otras reglamentaciones menos formales (*interpretative rules*) que se adoptan para darle uniformidad a sus propios procesos, **para pautar la discreción administrativa** o para otros fines internos y que, **aunque son de aplicación general y vinculan administrativamente, pueden ser modificadas judicialmente**." Agosto Serrano v. Fondo del Seguro del Estado, 132 D.P.R. 866, 873 (1993).

Los reglamentos así promulgados, por disposición de ley, quedan exentos del proceso de reglamentación formal. 3 L.P.R.A. sec. 2102(l). Estas son las llamadas reglas interpretativas. Por otra parte, las reglas que sí tienen que ser aprobadas mediante el proceso de reglamentación de la LPAU son conocidas como reglas legislativas.

"[U]na regla legislativa es aquella que crea derechos, impone obligaciones y establece un patrón de conducta que tiene fuerza de ley." Municipio de San Juan v. Junta de Calidad Ambiental, res. el 14 de diciembre de 2000, 2000 TSPR 183. "Una regla interpretativa, en cambio, sólo pretende clarificar o dar uniformidad a procedimientos internos, o pautar la discreción administrativa." Id. Una característica importante que

distingue a un tipo de regla de la otra es que las reglas interpretativas no pueden ir en contra de una previa regla legislativa.   Id.

Algunos comentaristas incluso han opinado que una regla interpretativa se utiliza por una agencia cuando no hay una autorización legislativa expresa o implícita para promulgar dicha regla con fuerza de ley. Bonfield, supra, sec. 6.9.1.   Por lo tanto, como dichas reglas no se promulgan con fuerza de ley, los tribunales pueden sustituir su juicio por el de la agencia cuando se enfrentan a una regla interpretativa.   Id.

Uno de los tipos de reglas interpretativas son las declaraciones generales de política pública. Con respecto a éstas, Davis nos explica que no establecen una norma obligatoria, y no determinan de forma final las cuestiones o los derechos a los que van dirigidas. Davis and Pierce, supra, sec. 6.2. La agencia **no puede aplicar o depender** de una declaración de política general ya que la misma únicamente proclama las intenciones tentativas de la agencia para el futuro. Id. De esta manera, en West Virginia, por ejemplo, se especifica mediante legislación que las agencias no pueden depender de una regla interpretativa "para imponer una sanción criminal o civil, ni para regular conducta privada ni el ejercicio de derechos privados o privilegios, ni para conceder ningún derecho ni privilegio no provisto por ley."  W. Va. Code sec. 29a-1-2(c) (1982).

La jurisprudencia de algunos otros estados puede ayudarnos, también, a entender mejor el efecto legal de las reglas interpretativas. En Gilbert v. State Department of Fish and Game, 803 P.2d 391, 396-397 (Alaska 1990), el tribunal invalidó una regla por entender que no caía bajo la categoría de regla interpretativa porque hacía más específica la ley ejecutada o administrada y afectaba al público. Gilbert, supra. En ese caso, se resolvió, además, que la agencia no podía depender de dicha regla hasta que los procedimientos de reglamentación se llevaran a cabo. Id.

En Maine, los tribunales también han resuelto que una regla no es interpretativa si hace más específica la ley que administra la agencia y si limita definitivamente la discreción de la agencia al otorgar privilegios. New England Whitewater Center, Inc. v. Department of Inland Fisheries and Wildlife, 550 A.2d 56, 61-64 (Me. 1988).

Cabe destacar, además, que en un caso similar al de autos, relacionado a solicitudes de Certificados de Necesidad, el Tribunal Supremo de Alabama decidió que una regla que establecía requisitos para el otorgamiento de los Certificados constituía una regla legislativa y tenía que pasar por el proceso de reglamentación para ser válida. Ex parte Traylor Nursing Home, Inc., 543 So. 2d 1179 (Ala. 1988). En el caso de autos, debemos decidir si el Memorando Circular constituye una regla legislativa o una regla interpretativa.

El Memorando en este caso no contradice el Reglamento, pero sí intenta especificar un poco lo que expone la regla legislativa. Por ejemplo, el Memorando establece que se utilizará como medida de la concentración económica en el área de servicio el Herfindahl-Hirschman Index. Por lo tanto, el Memorando establece criterios nuevos a considerarse al decidir si se otorgan o no privilegios a entidades privadas. Estas determinaciones tienen, sin duda,  un efecto directo sobre los derechos de las partes fuera de la agencia. Por lo tanto, como la intención de este Memorando era hacer más específicos los criterios establecidos mediante la reglamentación, y afecta los derechos de las partes envueltas, las reglas que se intentaron establecer constituyen reglas legislativas.  Como dicho Memorando no fue promulgado a través del proceso de reglamentación requerido por la LPAU, el mismo es inválido.

Esto no quiere decir, sin embargo, que el Secretario o Secretaria de Salud no puede aplicar la política pública encarnada en el Memorando al evaluar las solicitudes. Véase, e.g., Pennsylvania Human Relations Commission v. Norristown Area School Dist., 374 A.2d 671 (Pa. 1977) (resolviendo que se puede utilizar una declaración general de política pública como fundamento para una decisión adjudicativa). Pero al hacerlo tiene que sustentar dicha política contra cualquier impugnación

de las partes como si el Memorando nunca se hubiese promulgado, ya que dicho Memorando no tiene fuerza de ley.[6]

Es importante advertir que, aunque las declaraciones generales de política pública pueden ser muy útiles para informar al público sobre las intenciones de las agencias y para pautar la discreción administrativa, una agencia no puede simplemente eliminar sus reglamentos y reinstalarlos, sin el beneficio del proceso de reglamentación, a través de reglas interpretativas. La experiencia ha demostrado una inclinación por parte de las agencias de promulgar "boletines", "anuncios", "guías", "memorandos" y otros documentos "interpretativos" que en su operación y efecto legal constituyen reglas legislativas, para esquivar el proceso de reglamentación. Véase, Bonfield, supra, sec. 3.3.1. No vamos a permitir que las agencias se adjudiquen de esta manera una patente de corso que les provea una discreción casi ilimitada. Entendemos, sin embargo, que las reglas interpretativas pueden ser de gran valor, ya que le permiten a las agencias pautar la discreción administrativa de manera más informal, limitando así las posibilidades de que se llegue a decisiones de manera arbitraria, y que "son el método principal mediante el cual miembros afectados del público pueden **informarse del contenido preciso de sus derechos y deberes bajo la ley administrada por la agencia.**" Bonfield, supra, sec. 6.9.1 (*énfasis y traducción nuestros*).

---

[6] "When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never

## VI

Por todos los fundamentos expuestos, resolvemos que el Reglamento 89 del Departamento de Salud adolece de un nivel de ambigüedad que hace probable el ejercicio arbitrario o caprichoso de la discreción de la agencia, y que deja a los solicitantes desprovistos de guías adecuadas que los ayuden a tomar decisiones en cuanto a sus proyectos de facilidades de servicios de salud, y a preparar sus solicitudes para obtener Certificados de Necesidad. Tomando en cuenta, además, los serios defectos de los que adoleció el proceso de reglamentación, invalidamos el Reglamento 89 y revocamos la sentencia del Tribunal de Circuito de Apelaciones.

Como hemos mencionado anteriormente, el Reglamento 89 no satisface el mandato de la Ley 2, y las exigencias del debido proceso de ley y de la doctrina de no-delegación por dejar puertas abiertas a la arbitrariedad y los caprichos, y por no proveer guías adecuadas a los solicitantes de Certificados de Necesidad.

En vista que dicho reglamento, en su Artículo IX cláusula 1, derogó y sustituyó el anterior Reglamento 56, al invalidar el mismo queda en vigor este último. Por ello, el Departamento de Salud deberá evaluar bajo los parámetros establecidos en el Reglamento 56 todas las solicitudes de Certificados de Necesidad que sean sometidas desde que esta decisión advenga final y firme. Además, será de aplicación el Reglamento 56 a

been issued.  Pacific Gas & Elec. Co. v. Federal Power Commission, 506 F.2d

todas las solicitudes de Certificados de Necesidad que estén pendientes en el Departamento de Salud.

En cuanto a las solicitudes que han sido evaluadas bajo el Reglamento 89, y aprobadas o denegadas al momento que advenga esta decisión final y firme, y que sean impugnadas ante los tribunales, por aún no ser finales y firmes, serán revisadas de manera consistente con esta Opinión.  Los tribunales han de asegurar que estas decisiones adjudicativas del Departamento de Salud sean detalladas, razonadas y bien fundamentadas. Además, las mismas deben ser consistentes entre sí, con las adjudicaciones anteriores que ha hecho el Departamento, y con los criterios generales que establece la Ley 2.  De este modo, los tribunales podrán constatar que estas decisiones no hayan sido arbitrarias o caprichosas.

Claro está, esta decisión no impide que el Departamento de Salud enmiende o revise, si así lo estima necesario, el Reglamento 56 siempre y cuando lo haga a la luz de lo resuelto en esta Opinión.

Se dictará la Sentencia correspondiente.


                                        Federico Hernández Denton
                                        Juez Asociado

---

33 (D.C. Cir. 1974).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asociación de Farmacias de
la Comunidad y otros

    Demandantes-Peticionarios

         vs.                    CC-1999-597    Certiorari

Departamento de Salud

    Demandado-Recurrido


SENTENCIA


San Juan, Puerto Rico, a 5 de febrero de 2002.

    Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la sentencia del Tribunal de Circuito de Apelaciones y se invalida el <u>Reglamento Núm. 89 para Regular el Proceso de Evaluación de Solicitudes para el Otorgamiento de Certificados de Necesidad y Conveniencia</u>.

    Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo Interina. El Juez Asociado señor Corrada del Río emitió Opinión Concurrente y Disidente a la que se unió el Juez Asociado señor Rivera Pérez. El Juez Asociado señor Fuster Berlingeri no intervino.


                      Carmen E. Cruz Rivera
             Secretaria Tribunal Supremo Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Asociación de Farmacias de la Comunidad; Colegio de Farmacéuticos de P.R.; Sociedad Radiológica de P.R.; American College of Radiology, Capítulo de Puerto Rico; Asociación Puertorriqueña de Dueños de Laboratorios Clínicos Privados, Inc.; Colegio de Tecnólogos Médicos de P.R.; Farmacia Claudio, Inc., Laboratorio Ríos Lisojo (Lcdo. Jorge Ríos, Las Marías) | * * * * * * * * * * | CC-1999-597 |
| Peticionarios | * | |
| vs. | * | |
| Departamento de Salud | * | |
| **Recurrida** | * | |

Opinión Concurrente en parte y Disidente en parte emitida por el Juez Asociado señor Corrada del Río a la cual se une el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 5 de febrero de 2002.

El resultado inusitado al que arriba la mayoría de este Tribunal nos mueve a plasmar nuestro sentir por escrito. Concurrimos con la mayoría al resolver que el Reglamento Núm. 89 para Regular el Proceso de Evaluación de Solicitudes para el Otorgamiento de Certificados de Necesidad y Conveniencia (Reglamento Núm. 89) no contraviene la ley en virtud de la cual fue promulgado. No obstante, disentimos, por entender que el Reglamento Núm. 89, *supra*, no es ambiguo.

**I**

El 25 de agosto de 1997 el Departamento de Salud (Departamento), mediante aviso al público contenido en el periódico "The San Juan Star", notificó su intención de emitir un nuevo reglamento con el propósito de regular el proceso de evaluación de solicitudes para el otorgamiento de certificados de necesidad y conveniencia, en virtud de la Ley Núm. 2 del 7 de noviembre de 1975, según enmendada, 24 L.P.R.A. sec. 334 *et seq.* (Ley Núm. 2).

A través de dicho aviso, el Departamento, además de expresar el propósito de la adopción del reglamento, señaló el lugar y horas disponibles para revisar una copia del mismo, y estableció un plazo de treinta (30) días, contados a

partir de la publicación del aviso, para someter comentarios por escrito. Por último, indicó que aquél interesado en solicitar la celebración de una "vista administrativa para la discusión de los comentarios" debía presentar, dentro del término antes mencionado, una petición por escrito, en conjunto con un memorando exponiendo las justificaciones para la realización de una vista pública.[7]

Ante ello, dentro del término dispuesto, la Asociación de Farmacias de la Comunidad, el Colegio de Farmacéuticos de Puerto Rico, el American College of Radiology -Capítulo de Puerto Rico-, la Asociación Puertorriqueña de Dueños de Laboratorios Clínicos Privados, Inc., el Colegio de Tecnólogos Médicos de Puerto Rico, la Farmacia Claudio, Inc. y el Laboratorio Ríos Lisojo (peticionarios) comparecieron y solicitaron que se llevase a cabo una vista pública. A tales fines, el Departamento, vía facsímil, notificó la celebración de la misma.

Llegado el 29 de septiembre de 1997, los peticionarios acudieron a la vista, presentaron sus ponencias e impugnaron el reglamento por éste alegadamente adolecer de varios defectos.

Luego de analizar los comentarios y sugerencias, y acoger algunos de éstos, el 16 de octubre de 1997, el Departamento aprobó el Reglamento Núm. 89, *supra*. Tras ser presentado en el Departamento de Estado el 20 de octubre de 1997, dicho reglamento entró en vigor el 19 de noviembre del mismo año.

Posteriormente, el 16 de diciembre de 1997, dentro del término estatutario para impugnar de su faz la validez de un reglamento,[8] los peticionarios recurrieron, vía revisión, ante el Tribunal de Circuito de Apelaciones (TCA) impugnando el referido reglamento. Sostuvieron, en síntesis, que: (1) el procedimiento llevado a cabo para aprobar el Reglamento Núm. 89, *supra*, era contrario a derecho, (2) dicho reglamento es nulo por ser

---

[7] Apéndice de la petición de *certiorari*, pág. 84.
[8] "Cualquier acción para impugnar la validez de su faz de una regla o reglamento por el incumplimiento de las disposiciones de este capítulo deberá iniciarse en el Tribunal Circuito de Apelaciones dentro de los treinta (30) días siguientes a la fecha de vigencia de dicha regla o reglamento. La competencia sobre la acción corresponderá al Circuito de la región judicial donde está ubicado el domicilio del recurrente." Sec. 2.7(b) de la Ley de Procedimiento Administrativo Uniforme (LPAU), 3 L.P.R.A. sec. 2127(b). Véase, *Asoc. Dueños Casas Parguera, Inc. v. J.P.*, res. el 14 de mayo de 1999, 99 TSPR 75, 148 D.P.R. ___ (1999), 99 JTS 81, pág. 1026; *Montoto v. Lorie*, res. el 11 de marzo de 1998, 98 TSPR 23, 145 D.P.R. ___ (1998), 98 JTS 25, pág. 659.

contrario a la ley al amparo de la cual se promulgó, y (3) el mismo es inconstitucional por razón de ambigüedad.

Así las cosas, el TCA, mediante sentencia de 10 de mayo de 1999, notificada el 14 de mayo, resolvió que los procedimientos se condujeron conforme a derecho, que el reglamento no era contrario a la ley, y que el mismo no era arbitrario ni caprichoso. Por lo que, concluyó que "el Reglamento impugnado t[enía] fuerza de ley por haber cumplido con los trámites procesales requeridos para su validez."[9] Los peticionarios, oportunamente, presentaron moción de reconsideración, denegada por el TCA, mediante resolución de 23 de junio de 1999, notificada el 9 de julio.

Inconformes, el 9 de agosto de 1999, los peticionarios acudieron ante nos, vía *certiorari*, imputándole al TCA la comisión de los siguientes errores:

A. Erró el Honorable Tribunal de Circuito de Apelaciones al confirmar la validez del Reglamento núm. 89.

B. Erró el Honorable Tribunal de Circuito de Apelaciones al sostener que el Reglamento núm. 89 no es ambigüo, arbitrario, e inconsistente en su aplicación.

C. Erró el Honorable Tribunal de Circuito de Apelaciones al resolver que el Reglamento impugnado tiene fuerza de ley por haber cumplido con los trámites procesales requeridos para su validez.

II

Por entender que el incumplimiento sustancial con el trámite procesal privaría a este Tribunal de discutir los planteamientos sustantivos, comenzamos nuestro análisis, al igual que la mayoría, atendiendo el tercer señalamiento.

Los peticionarios, en síntesis, aducen que el aviso publicado por el Departamento no cumplía con la LPAU, *supra*, y que el trámite de vista pública no siguió el procedimiento establecido en la Ley Núm. 2, *supra*. Además, la mayoría esboza un planteamiento no traído a la atención de este Tribunal, la alegada falta de preparación del informe por el oficial examinador.

A. *Aviso publicado en el periódico The San Juan Star*

---

[9] Apéndice de la petición de *certiorari*, pág. 310.

En específico, los peticionarios alegan que el aviso era insuficiente ya que en el mismo el Departamento no expresó su intención de derogar el entonces vigente Reglamento Núm. 56.[10]

La LPAU, *supra*, en lo pertinente, dispone que "[s]iempre que la agencia pretenda adoptar, enmendar o derogar una regla o reglamento, publicará un aviso en un periódico de circulación general en Puerto Rico....El aviso contendrá *un resumen o explicación breve de los propósitos de la propuesta acción*...." (Bastardillas nuestras.) Sec. 2.1 de la LPAU, 3 L.P.R.A. sec. 2121.

Es decir, la LPAU, *supra*, requiere una declaración sucinta del objetivo del reglamento o regla formulado. Al respecto, el Profesor Fernández Quiñones comenta que "[e]l aviso sólo debe contener lo esencial de la regla propuesta o puede muy bien describir los temas que cubre." D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da ed., Colombia, Ed. Forum, 2001, sec. 3.2, pág. 112. Añade que "[l]a regla no se decreta inválida porque difiera de lo propuesto siempre y cuando los temas fueran debidamente notificados al público en general. La disponibilidad del texto completo de la regla y el notificarlo en el aviso subsana cualquier otro defecto, siempre que se cubran los temas esenciales." *Íd.*

El Departamento, mediante el aviso en cuestión, señaló diáfanamente que tenía la intención de adoptar un reglamento para sistematizar el procedimiento de evaluación de las solicitudes de certificados de necesidad y conveniencia, en virtud de la Ley Núm. 2, *supra*.[11] Indicó, de igual modo, que el propósito de dicho reglamento era regular la expedición de los certificados de necesidad

---

[10] Reglamento del Secretario de Salud Núm. 56 para Establecer Todo lo Relacionado con las Solicitudes de Certificado de Necesidad y Conveniencia y el Otorgamiento de Éstos; Establecer las Normas que se Requerirán a los Solicitantes; Fijar Penalidades y para Otros Fines. Este reglamento se promulgó al amparo de la Ley Núm. 2, *supra*. El mismo fue radicado en el Departamento de Estado el 15 de agosto de 1986.

[11] Dicho aviso, en lo referente, reza como sigue:

**AVISO AL PÚBLICO**

Mediante la presente se notifica al público en general de la intención del Departamento de Salud de adoptar los siguientes Reglamentos:
**continúa...**

...**continuación**

1) Reglamento para Regular el Proceso de Evaluación de Solicitudes para el Otorgamiento de Certificados de Necesidad y Conveniencia al amparo de las disposiciones de la Ley Número 2 del 7 de noviembre de 1975, según enmendada y ....Los reglamentos propuestos tienen el *propósito de reglamentar la expedición de Certificados de Necesidad y Conveniencia...* (Bastardillas nuestras.) Apéndice de la petición de *certiorari*, pág. 84.

y conveniencia. Además, en el borrador del reglamento disponible para el público, el Departamento incluyó una cláusula mediante la cual dejaba sin efecto el Reglamento Núm. 56, *supra*.[12]

Conforme a lo antes expresado, nos es forzoso concluir que el aviso publicado por el Departamento cumplió con el requisito de una explicación breve del propósito del reglamento propuesto, conforme a lo establecido por la LPAU, *supra*. Resultaba innecesario incluir en el aviso una expresión sobre la determinación del Departamento de eliminar el Reglamento Núm. 56, *supra*, pues, era claro que el nuevo reglamento tenía el propósito de regular los mismos asuntos incluidos en el primero. Además, no podemos perder de perspectiva que los interesados podían examinar el borrador del reglamento propuesto, el que, en su Art. VIII, establecía sin lugar a dudas la intención del Departamento de derogar el reglamento entonces vigente.

Lo anterior no dispone de este asunto ya que, los peticionarios, luego de exponerlo sucintamente en la petición de *certiorari* y traerlo someramente en el alegato, sostienen que no pudieron "expresarse significativamente sobre el reglamento aprobado dentro del marco de referencia del propósito perseguido por el reglamento propuesto ya que el borrador del reglamento no contenía expresión alguna sobre el propósito que se incorporó al reglamento que finalmente se aprobó."[13] Añaden que "[n]o exist[ía] en el récord base ni explicación razonable para un cambio tan drástico del reglamento para regular el proceso de evaluación de solicitudes para el otorgamiento de certificados de necesidad y conveniencia...."[14]

Ante dicho planteamiento, la mayoría tilda de "lacónico"[15] el propósito del reglamento,[16] expresa que la explicación breve y concisa del mismo en un

---

[12] El Art. VIII de dicho borrador, inciso (1), exponía:

> 1. Cláusula Derogatoria – Este Reglamento deja sin efecto toda norma, pauta, procedimiento o parte de éstos que esté(n) en conflicto con sus disposiciones en particular, se deroga expresamente el Reglamento 56 del 14 de agosto de 1986, radicado en el Departamento de Estado el 15 de agosto de 1986. *Íd*., pág. 98.

[13] Alegato de los peticionarios, pág. 16.

[14] *Íd*., pág. 17.

[15] Opinión Mayoritaria, pág. 11.

[16] El Art. II del Reglamento Núm. 89, *supra*, dispone:

reglamento final requiere respuestas razonadas a los comentarios de los interesados y, finalmente, concluye que la explicación contenida en el Reglamento Núm. 89, *supra*, es insuficiente. Funda tal posición en que la no inclusión de las contestaciones de la agencia a las manifestaciones de los participantes limita su función revisora, ya que no puede concretar qué asuntos de política pública se ventilaron y qué sugerencias se hicieron, impidiéndole determinar si la agencia actuó arbitraria o caprichosamente. Dicha postura es errónea.

En primer lugar, la mayoría –vía *fíat judicial*– enmienda la LPAU, *supra*, imponiéndole al Departamento un requisito no establecido por el legislador. De conformidad con dicho estatuto, el texto del reglamento "adoptado o enmendado" sólo tiene que contener, en lo pertinente, "una explicación breve y concisa de sus propósitos o de las razones para su adopción o enmienda." Sec. 2.5(b) de la LPAU, 3 L.P.R.A. sec. 2125(b). Requerirle a la agencia incluir una relación de los comentarios de las partes, así como las respuestas correspondientes, atenta contra la brevedad y precisión requerida. Además, "la agencia no está obligada ni limitada por los comentarios en la formulación final de la regla." Fernández Quiñones, *op. cit.*, pág. 114.

En segundo lugar y no menos importante, a los fines de evaluar si la actuación de la agencia, mediante la promulgación del reglamento, fue o no arbitraria, los tribunales debemos inspeccionar los documentos incluidos en el expediente de la agencia y no meramente descansar en una explicación breve y concisa contenida en el reglamento adoptado.[17]

---

[e]l propósito del presente reglamento lo constituye el deseo del Departamento de Salud de agilizar y expeditar [sic] el proceso de consideración y análisis de las solicitudes de
**continúa...**
[10] **...continuación**
concesión de Certificados de Necesidad y Conveniencia así como atemperar dicho proceso a la actual política pública en torno a la prestación de servicios de salud en Puerto Rico según definida en las disposiciones de las leyes número 190 del 5 de septiembre de 1996 y la número 72 del 7 de septiembre de 1993, según enmendadas. Apéndice de la petición de *certiorari*, pág. 157.

[17] El expediente, conforme a la LPAU, *supra*, incluye, pero sin limitarse a, los siguientes:

(a) Copias de toda publicación en relación a [sic] la regla o al procedimiento.

En fin, para cumplir con lo establecido por la LPAU, *supra*, la agencia sólo tiene que, por así decirlo, contestar –de forma breve y concisa– cuál es el propósito del reglamento aprobado o por qué está adoptando el mismo.

A tales efectos, el Departamento expuso –de forma clara y sencilla– que, mediante el Reglamento Núm. 89, *supra*, se proponía facilitar y brindarle rapidez al procedimiento para la concesión de certificados de necesidad y conveniencia, así como ajustar dicho proceso a la actual política pública contenida en las leyes de la Reforma de Salud.[18] Sin embargo, dicha explicación no le agrada a la mayoría, que va más allá y expresa –como justificación– que el Departamento debió "expli[car] por qué ha decidido suplantar el Reglamento anterior con uno mucho más ambiguo y limitado."[19] No avalamos tal posición, por entender que el lenguaje incluido en el Reglamento Núm. 89, *supra*, satisface las exigencias de la LPAU, *supra*, y porque la mayoría pierde de perspectiva que el Reglamento Núm. 56, *supra*, no es objeto de controversia.

B.  *Vista pública*

Los peticionarios aducen que el Departamento no siguió los procedimientos establecidos en la Ley Núm. 2, *supra*, para la celebración de la vista pública mandatoria. Ello, debido a que el Departamento notificó la misma con cinco (5) días de antelación, cuando se requiere la publicación de un aviso en dos

---

(b) Toda petición, requerimiento, memorial o comentario escrito radicado ante la agencia y cualquier material escrito considerado por la agencia en relación a [sic] la adopción de la regla y al procedimiento seguido.

(c) Cualquier informe preparado por el oficial que presida la vista resumiendo el contenido de las presentaciones.

(d) Una copia de cualquier análisis regulatorio [sic] preparado en el procedimiento para la adopción de la regla.

(e) Una copia de la regla y una explicación de la misma.

(f) Todas las peticiones de excepciones, enmiendas, derogación o suspensión de la regla. Sec. 2.6 de la LPAU, 3 L.P.R.A. sec. 2126.

[18] Véase, nota al calce núm. 10, *ante*.

[19] Opinión Mayoritaria, pág. 15.

(2) periódicos de circulación general con un mínimo de quince (15) días. Art. 22 de la Ley Núm. 2, 24 L.P.R.A. sec. 334j.[20]

Entendemos que la desviación del procedimiento comprendido en la Ley Núm. 2, *supra*, no menoscabó el derecho de participación en la vista pública de las partes interesadas. En el caso de autos, el Departamento, cumpliendo con el propósito de realizar la vista pública mandatoria, celebró la misma, treinta y cinco (35) días después de la publicación del aviso en el periódico *The San Juan Star*, el 29 de septiembre de 1997. Cabe recordar que, mediante dicha publicación, el Departamento le informó al público, *inter alia*, su intención de adoptar el reglamento propuesto, el lugar y horario disponible para revisar un borrador del mismo, el plazo de treinta (30) días para someter los comentarios escritos y para solicitar la vista administrativa.[21] Es decir, las partes interesadas tuvieron oportunidad y tiempo suficiente para elaborar sus ponencias ya que tenían que preparar sus comentarios escritos y/o petición de vista dentro del plazo antes mencionado. Véase, *Hosp. San Pablo v. Hosp. Hnos. Meléndez*, 123 D.P.R. 720, 737-738 (1989).[22]

C.   *Informe del oficial examinador*

Tras escudriñar el expediente y no encontrar escrito alguno titulado informe del oficial examinador, la mayoría levanta, *motu proprio*, dicho argumento y concluye que dicho informe no se produjo.

La Sec. 2.3 de la LPAU, en lo pertinente, dispone que "[e]l funcionario que presida la vista preparará un informe para la consideración de la agencia, en el cual se resuman *los comentarios orales* que se expongan durante la vista." (Bastardillas nuestras.) 3 L.P.R.A. sec. 2123.

Sobre el particular, en el expediente administrativo del caso de autos obra un memorando de 8 de octubre de 1997 del oficial examinador, Manuel Fernández Mejías, dirigido al Director de la Oficina de Asesores Legales del

---

[20] Reconocemos que, al no contradecir el texto y el propósito de la LPAU, *supra*, es de aplicación la disposición referente a la vista pública contenida en la Ley Núm. 2, *supra*. *Asoc. Dueños Casas Parguera, Inc. v. J.P.*, supra; *Carabarín, et al. v. A.R.P.E.*, 132 D.P.R. 938, 952 (1993); *Hernández v. Golden Tower Dev. Corp.*, 125 D.P.R. 744, 748 n. 7 (1990).

[21] Apéndice de la petición de *certiorari*, pág. 84.

[22] El "publicar 'un aviso en un periódico de publicación general'...satisface el requisito de notificar a todas las personas afectadas por la regla propuesta." Fernández Quiñones, *op. cit.*, pág. 111.

Departamento de Salud. En dicho escrito, el suscribiente hace una relación de los comparecientes a la vista pública, indica que los participantes presentaron por escrito el contenido de sus ponencias y, finalmente, añadió los comentarios no incluidos en las mismas.[23]

---

[23] **Dicho memorando reza de la siguiente forma:**

> **RE:** PROPUESTA DE NUEVO REGLAMENTO PARA REGULAR EL PROCESO DE
>
> CONSIDERACION DE SOLICITUDES DE CERTIFICADOS DE NECESIDAD Y
>
> CONVENIENCIA

continúa...

[17] ...continuación

**En el caso de referencia luego de haber sido publicado el aviso de intención para la adopción del reglamento de referencia las siguientes personas e instituciones solicitaron la celebración de una vista pública:**

1- Pavía Health, Inc.
2- American College of Radiology
3- Colegio de Médicos Cirujanos
4- Sociedad Radiológica de Puerto Rico
5- Asociación de Hospitales
6- Colegio de Farmacéuticos
7- Walgreens of San Patricio
8- Lic. Mario L. Paniagua
9- Asociación Farmacias de la Comunidad
10- Ryder Hospital
11- Colegio de Tecnólogos Médicos
12- Asociación Puertorriqueña de Dueños de Laboratorios
13- Cámara de Comercio

De los antes expuestos todos fueron notificados de la celebración de la vista pública y acudieron a ella todos menos el Colegio de Médicos Cirujanos, Pavía Health y Cámara de Comercio. Todos los comparecientes sometieron por escrito el texto de sus ponencias las cuales obran en el expediente del caso.

**El Lic. Mario Paniagua comentó además en torno a la necesidad de definirse de una forma más concreta el concepto de "área de servicio". El Dr. David Guzmán en representación del Hospital Ryder así como el Lic. Milton Cruz de la Asociación de Hospitales se colocaron a la disposición del Departamento de Salud para colaborar en el proceso de adopción de un nuevo reglamento para la concesión de CNC's. El Lic. Milton Cruz sugirió además la**

En vista de lo anterior, entendemos que el memorando en cuestión cumple con la LPAU, *supra*.[24] Máxime, cuando la obligación del funcionario es resumir los comentarios orales, los cuales, en la situación de autos, constan en las ponencias incluidas en el expediente administrativo. El propósito de la disposición en cuestión es simplificarle al Secretario la labor de analizar y considerar las declaraciones de los comparecientes ya que no tiene que sentarse a escuchar una grabadora u observar a los deponentes a través de un monitor. Claro está, si el texto de los comentarios obra por escrito, resulta innecesario compendiar los mismos. Además, no podemos perder de perspectiva que, a diferencia de un procedimiento cuasi-adjudicativo, donde el funcionario aprecia el comportamiento (demeanor) y dirime cualquier conflicto de credibilidad, en una actuación cuasi-legislativa, como en la situación de autos, es preferible, en lo posible, recoger exactamente lo que las partes expresaron. Por lo cual, el error esgrimido por la mayoría no se cometió.

Atendidos los señalamientos procesales y debido a que el desvío del trámite de vistas públicas no constituyó un incumplimiento sustancial,[25] procedemos a discutir los planteamientos sustantivos.

III

---

**creación de un Comité de la Industria para colaborar en dicho proceso. Todos los demás extremos de las disposiciones de los asistentes a la vista constan en sus ponencias por escrito en el expediente administrativo del proceso.**

---

[24] El título de un documento no es lo determinante sino su contenido. Véase, *Correa Negrón v. Pueblo*, 104 D.P.R. 286,

[18] **...continuación**
293 (1975).

Por otra parte, es menester aclarar que el hecho de que el oficial examinador dirigió el memorando al Director de la Oficina de Asesores Legales del Departamento de Salud no menoscaba su validez como informe ya que dicha división es quien aconseja al Secretario del Departamento. Además, no podemos perder de vista que el aviso al público también fue suscrito por el antes referido director.

[25] La LPAU, *supra*, expresa que un reglamento "[es] nulo si no cumpl[e] sustancialmente con las disposiciones de [esta ley]." Sec. 2.7(a) de la LPAU, 3 L.P.R.A. sec. 2127(a).

Al respecto, el Profesor Fernández Quiñones comenta que "es imprescindible cumplir con los requisitos de notificación de la regla propuesta, concesión de oportunidad a la ciudadanía de presentar sus escritos y publicación de la regla adoptada. Ellos van a la médula del debido proceso de ley estipulado por la propia ley." Fernández Quiñones, *op. cit.*, pág. 121.

Los peticionarios, por otra parte, alegan que el Reglamento Núm. 89, *supra*, es inválido por ser contrario a la Ley Núm. 2, *supra*. Argumentan, además, que dicho reglamento es nulo porque adolece de vaguedad, por lo que su aplicación podría ser arbitraria.

*A. Reglamento Núm. 89, supra, es contrario a la Ley Núm. 2, supra.*

Estimamos, al igual que la mayoría, que el Reglamento Núm. 89, *supra*, no conflige con las disposiciones estatutarias bajo las cuales se promulgó.[26]

En la situación de autos, el Secretario del Departamento emitió el Reglamento Núm. 89, *supra*, a tenor de la Ley Núm. 2, *supra*. Este estatuto –en particular su Art. 3– faculta al Secretario del Departamento a fijar, mediante reglamentación, los requisitos para la expedición de los certificados de necesidad y conveniencia. 3 L.P.R.A. 334b.[27]

Por otra parte, el Secretario del Departamento, al promulgar el reglamento en cuestión, tomó en consideración los criterios establecidos por dicho artículo. A tales efectos, el Secretario del Departamento incluyó, en el reglamento adoptado, los cinco (5) requisitos fijados por el referido artículo e incorporó dos (2) adicionales. Estos últimos fueron adoptados en cumplimiento con los objetivos delineados por la Ley Núm. 2, *supra* –una planificación ordenada de las facilidades y servicios de salud, y proveer los servicios de Salud donde el Secretario estime que son necesarios y convenientes, 1983 Leyes de Puerto Rico 403-404–, y con los propósitos establecidos en las leyes de la Reforma de Salud –una mayor cobertura de los servicios médicos a las personas indigentes. Ello conlleva que el propósito del Reglamento Núm. 89, *supra*, esté en armonía con los fines perseguidos por

---

[26] "[U]n reglamento promulgado para implantar la ejecución de una ley puede complementarla, pero no estar en conflicto con ésta." (Énfasis suprimido.) *Franco v. Depto. de Educación*, res. el 30 de junio de 1999, 99 TSPR 105, 148 D.P.R. ___ (1999), 99 JTS 108, pág. 1252; *Carrero v. Depto. de Educación*, 141 D.P.R. 830, 837 (1996); *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 409 (1980). Ello implica que una regla o reglamento "claramente en conflicto o en contra de la ley es nulo." *P.S.P. v. Com. Estatal de Elecciones*, supra.

[27] Esta disposición, en lo pertinente, expresa lo siguiente:

"[e]l Secretario establecerá mediante reglamento los criterios para expedir o denegar el certificado de necesidad y conveniencia." 3 L.P.R.A. sec. 334b.

los estatutos mencionados. Es decir, existe una relación razonable entre el reglamento y dichas leyes.[28]

En vista de ello, concluimos que el Reglamento Núm. 89, *supra*, no contraviene lo dispuesto por la Ley Núm. 2, *supra*, y que no es arbitrario ni caprichoso. Por lo que, el mismo no es nulo.

B.    *El Reglamento Núm. 89 sufre del defecto de vaguedad.*

Los peticionarios esgrimen el argumento de que el Reglamento Núm. 89, *supra*, es vago, por lo que su aplicación podría resultar arbitraria o caprichosa. La mayoría acoge dicho planteamiento y, por tanto, concluye que el reglamento es vago. Tal postura es errónea, pues, analiza el Reglamento Núm. 89, *supra*, a la luz del Reglamento Núm. 56, *supra*. Es decir, la mayoría se apoya en que el reglamento objeto de controversia no contiene tantos criterios como el anterior.[29] ¿Es ambiguo un reglamento porque no es tan específico como el anterior? O, ¿no es vago un reglamento porque no hay uno previo? La vaguedad de un estatuto o de un reglamento no se mide comparando reglamentos.

De igual forma, tanto los peticionarios como la mayoría sostienen que el Reglamento Núm. 89, *supra*, adolece de vaguedad basándose en el caso *Soto v. Srio de Justicia*, 112 D.P.R. 477 (1982). Allí, expresamos "[c]uando, como en el caso de autos *no hay estándares* en la ley que gobiernen el ejercicio de la discreción que la ley reconoce, el esquema permite y promueve una aplicación arbitraria y discriminatoria de la ley." (Bastardillas en el original y citas omitidas.) *Soto v. Scrio. de Justicia*, pág. 499.

No obstante, aquella situación es distinguible de la autos. En *Soto v. Scrio. de Justicia*, supra, los allí peticionarios, como ciudadanos, alegaron violación del derecho constitucional de obtener información recopilada por el Estado en su gestión pública mientras que en el presente los peticionarios

---

[28] Además de no oponerse a la ley, el reglamento no puede ser caprichoso ni arbitrario. "Es necesario que la regla sea razonable. Es función del tribunal el determinar si existe una relación o conexión racional entre una regla o reglamento y el estatuto." (Nota omitida.) *Carrero v. Depto. de Educación*, supra, pág. 838. Véase, *Franco v. Depto. de Educación*, supra; Fernández Quiñones, *op. cit.*, sec. 3.4, pág. 135.

[29] "Nuestra conclusión se sustenta al considerar que el Reglamento 56 que promulgó el Departamento de Salud originalmente en el 1986, y que rigió el esquema de los Certificados de Necesidad por once años, era muy específico y extenso." Opinión Mayoritaria, págs. 31-32.

aducen –de forma vaga e imprecisa– que el Reglamento Núm. 89 es inconstitucional. Además, a diferencia del caso de *Soto*, supra, en el de autos, la Ley Núm. 2, *supra*, enumera unos criterios que debe incluir la reglamentación a ser aprobada, los cuales el Departamento adoptó al promulgar el Reglamento Núm. 89, *supra*.

Los requisitos delineados por la Ley Núm. 2, *supra*, más los dos (2) adicionales limitan la discreción del Secretario del Departamento y, al mismo tiempo, le brindan flexibilidad necesaria para expedir y otorgar los certificados de necesidad y conveniencia. Veamos.

La Ley Núm. 2, en su Art. 3, *supra,* establece los siguientes criterios, los cuales fueron específicamente incorporados en el Reglamento Núm. 89, *supra*, a saber:

1. La relación entre la transacción para la cual se solicita el certificado y el plan de desarrollo de servicios a largo plazo, si alguno, del solicitante.

2. La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma.

3. La existencia de alternativas a la transacción para la cual se solicita el certificado o la posibilidad de proveer los servicios contemplados de manera más eficiente o menos costosa que la propuesta por el solicitante.

4. La relación entre el sistema de salud operante en el área y la transacción propuesta.

5. En el caso específico de solicitantes de certificados de necesidad y conveniencia para el ofrecimiento de servicios de salud, el Secretario deberá considerar también los siguientes factores:

   (a) La disponibilidad de recursos humanos y económicos para el rendimiento eficiente de esos servicios.

   (b) El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de salud del área en donde los servicios habrán de prestarse.

   (c) El por ciento de la población del área a ser servida que tendrá acceso a los servicios propuestos. El Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizar el gasto objeto de la transacción.

**Además, el Secretario del Departamento tomará en consideración los siguientes criterios, añadidos por el Reglamento Núm. 89, *supra*:**

6. El nivel de competitividad y de eficiencia operacional de las facilidades de salud existentes en el área de servicio de la acción propuesta.

7. El nivel de concentración existente en el área de servicio de la acción propuesta y la medida en que un incremento en la oferta estimule la competencia en cuyo caso se podría favorecer la acción propuesta.

Como se puede apreciar, estos requisitos no son amplios –como alegan los peticionarios– pero tampoco son bastante rígidos que constituyan una camisa de fuerza y conlleven una aplicación irracional.[30] Éstos son lo suficientemente definidos para ayudar al Secretario a delinear una planificación ordenada al momento de otorgar los certificados de necesidad y conveniencia correspondientes. Pero, de igual forma, no son tan específicos –como pretenden los peticionarios– debido a que cada área geográfica o región tiene sus características peculiares. Los criterios adoptados permiten más flexibilidad en el otorgamiento de los certificados porque, en vez de conformar la aprobación de los mismos a criterios geográficos, el Secretario también considerará la competitividad, la eficiencia operacional y la calidad del servicio. De este modo, existe mayor probabilidad de que un servicio determinado se provea adecuadamente dentro de un área geográfica o región. A tales fines, el Reglamento Núm. 89, *supra*, requiere que toda solicitud para el otorgamiento de un certificado de necesidad y conveniencia tiene que venir acompañada de, entre otros, un estudio financiero de viabilidad económica. Art. V(2)(c) del Reglamento Núm. 89, *supra*. Además, al delimitar el concepto área de servicio y definir las regiones, el reglamento incluye parámetros para precisar la necesidad actual y proyectada y medir el nivel de concentración dentro del área de servicio.

---

[30] Nos parece pertinente la siguiente expresión que, aunque referente a nuestra Constitución entendemos que es de aplicación al presente caso:

> [t]ambién debemos evitar que interpretaciones inflexibles y el apego a viejos modelos impidan su aplicabilidad a las eventualidades del futuro y en pocos años tornen obsoleta una constitución diseñada para guiar la vida de un pueblo por varios siglos....Tampoco debemos olvidar que "'el sentido de hoy no es siempre el sentido de mañana'...." (Citas omitidas.) *Nogueras v. Hernández Colón*, 127 D.P.R. 405, 411 (1990).

Por otra parte, los peticionarios argumentan que el Secretario tiene absoluta discreción ya que puede balancear los criterios en la manera que estime pertinente. Dicho planteamiento carece de méritos. En *Lab. Inst. Med. Ava. v. Lab. C. Borinquen*, res. el 9 de septiembre de 1999, 99 TSPR 136, 149 D.P.R. ___ (1999), 99 JTS 141, pág. 41, resolvimos, bajo el Reglamento Núm. 56, *supra*, que el Secretario "[t]iene discreción para obviar un criterio reglamentario, cuando ello sea procedente." Añadimos que "una interpretación contextual de la Ley Núm. 2 referida claramente revela...que el legislador dejó en manos del Secretario la determinación de conceder o denegar los certificados requeridos, sujeto a unas guías y criterios, que aparejan un ámbito de discreción." (Nota omitida.) *Íd*.

Además, el Secretario, en su función adjudicativa –al momento de otorgar o denegar un certificado–,[31] tiene que formular determinaciones de hechos sostenidas por evidencia sustancial. *Hosp. San Pablo v. Hosp. Hnos. Meléndez*, supra, pág. 733. Ello implica que, de eximir al solicitante de algún criterio o si le dio más peso a un requisito que a otro, el Secretario está obligado a explicar el razonamiento detrás de tal determinación, la cual tiene que estar sustentada por evidencia sustancial y, además, está sujeta a revisión judicial.[32]

Por lo que, contrario a la mayoría, concluimos que el Reglamento Núm. 89, *supra*, no es ambiguo ya que los criterios contenidos en el mismo son suficientes para limitar y encauzar la discreción del Secretario.[33]

IV

Finalmente, también cabe señalar que la mayoría erró al declarar nulo el Reglamento Núm. 89, *supra,* y reinstalar el Reglamento Núm. 56, *supra.* La

---

[31] El Secretario también establece política pública mediante el procedimiento adjudicativo. *Lab. Inst. Med. Ava. v. Lab. C. Borinquen*, supra, págs. 40-41; *Ruiz Hernández v. Mahiques*, 120 D.P.R. 80, 87 (1987).

[32] Cabe añadir que "[l]a Ley Núm. 2, *supra*, establece un procedimiento administrativo de *naturaleza formal*, el cual ofrece suficientes garantías para asegurar que dicho proceso se lleve a cabo con pureza administrativa." (Bastardillas en el original y, cita y nota omitidas.) *Íd*.

[33] Respecto al Memorando Circular 1997-1, estamos contestes con la mayoría al determinar que las guías comprendidas en el mismo constituyen más que meras interpretaciones y que, por ende,

mayoría, mediante dicha actuación, establece una política pública no vigente en Puerto Rico atribuyéndose y usurpando funciones inherentes a otra rama gubernamental. Lo propio sería dejar en vigor el Reglamento Núm. 89, *supra*, y ordenarle al Departamento que siguiendo el procedimiento para enmendar un reglamento bajo la LPAU, *supra,* considere adoptar los criterios incorporados por el Memorando Circular 1997-1 y cualesquiera otras enmiendas a dicho reglamento, en lugar de dar marcha atrás para regresar al descartado Reglamento Núm. 56, *supra.*

Por otra parte, la mayoría ignora por completo el Art. IX del Reglamento Núm. 89, *supra,* que contiene una cláusula de separabilidad.[34] En el supuesto de que existiera la alegada ambigüedad, con lo cual no estamos de acuerdo, pudo haber limitado su decreto de nulidad al Art. VI de éste, el cual comprende los criterios impugnados. El remanente del reglamento es independiente de artículo en cuestión y, por ende, capaz de subsistir sin el mismo.[35]

Por los fundamentos aquí expresados, concurrimos con la parte del dictamen de la mayoría que resuelve que el Reglamento Núm. 89, *supra,* no es contrario a la Ley Núm. 2, *supra,* y que la aprobación del Memorando Circular 1997-1 no cumplió con los requisitos de la Ley de Procedimiento Administrativo Uniforme. Disentimos de la parte de la Opinión que declara nulo el Reglamento Núm. 89, *supra,* y reinstala la vigencia del Reglamento Núm. 56, *supra.*

BALTASAR CORRADA DEL RIO
JUEZ ASOCIADO

---

dicho documento debió promulgarse a tenor del procedimiento de reglamentación establecido en la LPAU, *supra*.

[34] Dicha disposición expresa lo siguiente:

> [c]ualquier disposición de este Reglamento o de cualquiera de las enmiendas que en el futuro se efectúen en el mismo, que se declaren nulas o inconstitucionales por una autoridad judicial competente, no afectarán la vigencia y validéz [sic] de sus restantes disposiciones, sino que su efecto se limitará a la palabra, inciso, oración o parte específicamente afectada. Apéndice de la petición de *certiorari* págs. 173-174.

[35] El Reglamento Núm. 89, *supra,* incluye las siguientes disposiciones, entre otras: (1) procedimiento para el recibo y evaluación de solicitudes –Art. V–, (2) solicitudes especiales y exenciones –Art. VII–, (3) término y vigencia del certificado de necesidad y conveniencia –Art. VIII. Apéndice de la petición de *certiorari*, págs. 167-169, 171-173.